UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

MOHAMED TAHLIL MOHAMED,
　　also known as "Tahlil Mohamed,"
"Mohamed Tahlil," "Maxamed Tahliil
Guure," "the Taliye" and "Mohamed the
Taliye," and

ABDI YUSUF HASSAN,

　　　　　　　　　　　　　*Defendants*.

18-cr-603 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

**OPINION & ORDER**

ROSS, United States District Judge:

　　I have before me several motions in limine submitted by both the government and defendants Mohamed Tahlil Mohamed and Abdi Yusuf Hassan. The government moves for rulings that: (1) statements made during approximately thirteen ransom and proof-of-life calls are admissible at trial; (2) the defendants' out-of-court statements are inadmissible at trial; (3) prior consistent statements of the government's witnesses are admissible at trial if their credibility is impeached; and (4) the government's summary charts are admissible to prove the content of defendants' Facebook communications. Defendants move for rulings that: (1) the entirety of Mr. Mohamed and Michael Scott Moore's Facebook message history is admissible under Federal Rule of Evidence 106 (the "rule of completeness") or the then-existing state of mind hearsay exception; (2) messages between defendants and alleged coconspirators sent after the end of the charged conspiracy are inadmissible; (3) a photograph depicting a hostage's torture is inadmissible as unduly prejudicial and cumulative; and (4) Mr. Hassan's post-arrest statement denying knowledge of Mr. Mohamed is inadmissible. In response to the government's second motion, Mr. Hassan

requests a ruling that his entire videotaped post-arrest interview is admissible under the rule of completeness.

For the following reasons, I rule that (1) the ransom and proof-of-life calls are admissible; (2) the entire Facebook message exchange between Mr. Mohamed and Mr. Moore is not admissible under the rule of completeness or the then-existing state of mind hearsay exception; (3) the entire videotaped recording of Mr. Hassan's post-arrest statement is not admissible under the rule of completeness; (4) the government's motion to admit prior consistent statements is premature; (5) the government's summary charts are admissible; (6) the government's other Facebook exhibits are conditionally admissible; (7) the hostage torture photograph is admissible; and (8) Mr. Hassan's post-arrest statement regarding Mr. Mohamed is admissible.

## I.   Ransom and Proof-of-Life Calls

The government moves for admission at trial of approximately thirteen audio recordings of ransom and proof-of-life calls involving Michael Scott Moore and/or his mother, Marlis Saunders. Gov't Suppl. Mots. in Lim. ("Gov't Mot.") 2, ECF No. 150. The government argues that the recordings are admissible because most of the statements therein will be offered to prove the fact of the ransom demands and proof-of-life communications, rather than for the truth of the matters asserted in the statements. To the extent any statements will be offered for their truth, the government argues that those statements are admissible as non-hearsay coconspirator statements under Rule 801(d)(2)(E) if made by one of the hostage takers, or as present sense impressions under Rule 803(1) if made by Mr. Moore. Defendants do not object to the admission of the recordings to the extent they are not offered for their truth, though they reserve the right to object at trial to the admission of certain phone calls on Rule 403 grounds such as cumulativeness.

The government's motion is granted, subject to two qualifications. First, I will consider Rule 403 objections if and when they are made by defendants. Second, to the extent any portion of the recordings are offered for the truth of the matter asserted in the recordings, those portions are admissible on the condition that the government makes the requisite showing that the recordings fall within a hearsay exception. *See, e.g.*, *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (explaining that admission of coconspirator statement requires finding by preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy" (citation omitted)).

## II.   Defendants' Out of Court Statements

The government's anticipated trial exhibits include hearsay statements made by defendants. Hearsay is defined as a statement that "the declarant does not make while testifying at the current trial or hearing" and that is offered in evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is generally not admissible at trial. Fed. R. Evid. 802. However, a party's own statement offered against him is not hearsay. Fed. R. Evid. 801(d)(2). The government moves to preclude defendants from introducing their own hearsay statements at trial because, unlike a statement offered against an opposing party, a defendant's out-of-court statements offered for the truth of the matter asserted are inadmissible hearsay. *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). In response, Mr. Hassan moves to admit the entire videotaped recording of his post-arrest statement under the rule of completeness. Separately, Mr. Mohamed moves to admit all the messages exchanged between Mr. Mohamed and Mr. Moore on Facebook under the rule of completeness or the then-present state of mind hearsay exception.

### A.  Facebook Messages

Mr. Mohamed and Mr. Moore engaged in intermittent correspondence over Facebook from November 2014 to at least July 2018.[1] During this time, the men, *inter alia*, exchanged pleasantries, discussed Mr. Moore's captivity in Somalia, grappled with translation issues, and arranged for Mr. Mohamed to come to the United States. The government has identified 46 excerpts of the Facebook conversation it plans to introduce as evidence at trial, along with corresponding translations. In nearly all the excerpts, Mr. Mohamed shares information about Mr. Moore's captivity and/or identifies individuals involved in his captivity, often in response to questions posed by Mr. Moore. Mr. Mohamed seeks to admit the rest of the Facebook conversation on two grounds: the rule of completeness and the then-present state of mind exception to the rule against hearsay.

Rule 106 states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. This rule requires admission of an omitted statement only when the statement is "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotation marks and citation omitted). When an omitted statement that is otherwise hearsay is "properly introduced to correct a misleading impression or place in context that portion already admitted, it is . . . admissible for a valid, nonhearsay purpose."

---

[1] The Facebook message history produced by the government ends in July 2018. Though Mr. Mohamed represents that there are messages between him and Mr. Moore after that date, Defs.' Mots. in Lim. ("Defs.' Mot.") 4 n.2, ECF No. 149, he does not seek to have the missing messages produced or entered in evidence.

*United States v. Williams*, 930 F.3d 44, 60 (2d Cir. 2019) (emphases omitted). The rule "does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Marin*, 669 F.2d at 84. In applying the rule of completeness, it is my "responsibility to exercise common sense and a sense of fairness to protect the rights of the parties while remaining ever mindful of the court's obligation to protect the interest of society in the 'ascertainment of the truth.'" *United States v. Castro*, 813 F.2d 571, 576 (2d Cir. 1987) (quoting Fed. R. Evid. 611(a)). And of course, "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402; *see* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Mr. Mohamed insists that the rule of completeness requires admission of all the approximately 1,600 additional Facebook messages between Mr. Mohamed and Mr. Moore—an improbable claim given the narrow exception allowed by the rule of completeness. Mr. Mohamed is correct that the rule of completeness is motivated by "a principle of fairness," *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995), but fairness does not require the admission of the *entire* message history absent a more specific showing that the government's exhibits are rendered misleading, void of context, or confusing due to the omission of certain messages, *see Johnson*, 507 F.3d at 796; *see also United States v. Aungie*, 4 F.4th 638, 646–47 (8th Cir. 2021) (explaining that movant must specify which portions of omitted testimony are both relevant and clarifying to the testimony already admitted); *United States v. Glover*, 101 F.3d 1183, 1189–90 (7th Cir. 1996) (same). Much of the message history, such as the lengthy discussions between the men about arrangements for Mr. Mohamed to come to the United States, is irrelevant. And many of the

messages are confusing, including ones that appear to be authored by someone other than Mr. Mohamed. *See* Defs.' Mot., Ex. A ("DX A") 059–70, ECF No. 149-1.

Citing *United States v. Cooper*, No. 19-CR-159 (ARR), 2019 WL 5394622, at *8 (E.D.N.Y. Oct. 22, 2019), Mr. Mohamed argues that the government's exhibits support a misleading inference about his "consciousness of guilt." Defs.' Mot. 9. But in *Cooper*, I admitted, on Rule 106 grounds, a defendant's statement explaining why he fled the scene of a crime, which provided relevant and exculpatory context to the portion the defendant's statement that he fled the scene. 2019 WL 5394622, at *8. Here, none of the government's exhibits necessarily demonstrate consciousness of guilt; the assistance Mr. Mohamed provides Mr. Moore seems just as consistent with an exculpatory state of mind, if not more so. And the government represents it does not intend to argue that Mr. Mohamed's messages demonstrate consciousness of guilt. Gov't Opp'n to Defs.' Mots. in Lim. ("Gov't Opp'n") 11, ECF No. 156. Though the entire message exchange certainly provides context (in a very general sense) to the government's exhibits, Mr. Mohamed has not met his burden of proving that all 1,600 additional messages are necessary to explain or contextualize the government's relatively focused excerpts. *See Marin*, 669 F.2d at 84–85.

Because Mr. Mohamed cites a few specific examples to support his motion, I also consider whether the messages identified therein are admissible on Rule 106 grounds. The first example involves two of the government's anticipated trial exhibits, marked GX 1018 and GX 1019, which are pulled from a December 12, 2014 conversation, and which omit messages from Mr. Mohamed asking Mr. Moore if it's okay for them to communicate and explaining that many Somalis were sympathetic to Mr. Moore's plight. DX A 008–09. Mr. Mohamed argues that the omission "distort[s] the exchange by excluding the messages where Mohamed explains his sympathy for Moore, asks his permission to continue to communicate with him, and sends information on

Somali pirates only after Moore encourages him to do so." Defs.' Mot. 7.  The second example, GX 1023 and GX 1024, are two exhibits pulled from a December 30–31, 2014 conversation that omit messages in which Mr. Mohamed sends Mr. Moore two pictures of himself, expresses regret that Mr. Moore fell victim to piracy, and wishes Mr. Moore a "happy life." DX A 035–38. Mr. Mohamed argues that the omission strips the exhibits of context showing that Mr. Mohamed wanted Mr. Moore to recognize him and demonstrating that Mr. Mohamed believed he did nothing wrong and wished to continue helping Mr. Moore like he did in Somalia. Defs.' Mot. 7–8. The last example, GX 1037, is an exhibit in which Mr. Mohamed sends Mr. Moore a picture of an individual named Mohamed Garfanji that omits a message from Mr. Moore immediately preceding the exhibit where he says, "I will have news for you this week I hope," DX A 132, an apparent reference to the status of visa arrangements. Mr. Mohamed argues that this omission creates a "fundamentally inaccurate portrait of the nature of their communications and each party's reasons for engaging in them." Defs.' Mot. 8.

I find that none of these messages are admissible under the rule of completeness. In GX 1018, Mr. Mohamed sends Mr. Moore a picture of and information about a "petty pirate scout/guard" named Farhan. In GX 1019, Mr. Mohamed sends Mr. Moore pictures of men known as Bashko and Badal, respectively. The exhibits are not misleading absent the omitted messages between them, nor are those messages necessary to explain or contextualize the exhibits. In GX 1023, Mr. Mohamed recounts when the men first met, and Mr. Moore confirms he remembered Mr. Mohamed and the time Mr. Mohamed brought him medicine. In GX 1024, Mr. Mohamed answers a few of Mr. Moore's questions and sends him two pictures and a "Happy New Year" image. The beginning of GX 1024 is confusing, because Mr. Moore asks, "where are those men?", DX A 038, and it is not clear from the exhibit alone which men Mr. Moore is referencing. However,

the omitted messages do not provide any clarity. In the message immediately preceding Mr. Moore's question, Mr. Mohamed writes:

> I am very happy tonight to wellcom happy newyear you stay weth you are family to freedom but fery sorry you friends naham3 to still hand of piracy also after you to man dead other very sick i hope to help hem as you can you  as you fell hunfull of piracy i hope you happy life

*Id.* If this passage explained Mr. Moore's question it might be admissible under Rule 106; however, it is not clear that the question, which is sent about two minutes later, is responsive to Mr. Mohamed's message. Nor are any of the other messages between GX 1023 and GX 1024 necessary to contextualize or explain the exhibits. The same is true for the message preceding GX 1037. The promise of an update on the visa arrangements is simply not relevant to nor explanatory of the ensuing discussion about Mohamed Garfanji.

Mr. Mohamed next argues that the complete set of messages is independently admissible to demonstrate his state of mind while he was communicating with Mr. Moore. Under Rule 803(3), an exception to the rule against hearsay is made for a statement "of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). "The exclusion of 'statement[s] of memory or belief [proffered] to prove the fact remembered or believed' is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991) (quoting Advisory Committee Note to Fed. R. Evid. 803(3)).

Mr. Mohamed claims that the entire Facebook exchange is admissible to show that he was communicating with Mr. Moore with an innocent mind. Mr. Mohamed supports his argument with

two specific messages. In the first, he writes: "Fine, how're you? i hope u r fine. I'm happy u r out of bondage." DX A 005. In the second, he writes: "Cheers. I struggled to protect from harm. I am happy you  survived the ordeal, and reunited with ur mother and friends.." DX A 006. Mr. Mohamed argues that these statements are admissible to establish his state of mind while communicating with Mr. Moore, which is relevant to the jury's evaluation of his guilt or innocence because it supports an inference that he believed he did not commit a crime and wished to continue assisting Mr. Moore like he did in Somalia. Mr. Mohamed also argues that the statements are reliable because they were made pre-arrest when Mr. Mohamed lacked a motive to deceive. The government responds that Mr. Mohamed's state of mind months and years after the end of the charged conspiracy is irrelevant, most if not all of communications are offered for the truth of the proposition that Mr. Mohamed did help Mr. Moore in Somalia, and Rule 803(3) does not apply to self-serving, backward-looking statements made after the end of a charged conspiracy.

That the messages are self-serving is not important. In this Circuit, "the self-serving nature of a statement expressing a state of mind does not automatically preclude application of Rule 803(3). That concern is properly considered by the jury in deciding what weight to accord the statement." *United States v. Farhane*, 634 F.3d 127, 172 (2d Cir. 2011) (Raggi, J., concurring in part); *see United States v. DiMaria*, 727 F.2d 265, 271–72 (2d Cir. 1984). However, the government is correct that the entire Facebook exchange is not admissible under the relatively narrow exception offered by Rule 803(3). To admit the whole exchange in order to show Mr. Mohamed's general state of mind while intermittently communicating with Mr. Moore over many years on topics both relevant and irrelevant to this case, most of which do not shed light on Mr. Mohamed's then-existing state of mind, "would allow the 803(3) exception to swallow the rule."

*United States v. Mohamed*, No. 18 Cr. 603 (ARR), 2022 WL 3703200, at *4 (E.D.N.Y. Aug. 26, 2022).

Both messages offered as examples are also inadmissible. To be sure, "I'm happy u r out of bondage" is a statement of Mohamed's then-existing state of mind. But this statement was made following the end of the charged conspiracy. To the extent the statement is offered solely to demonstrate Mr. Mohamed's state of mind in the months following Mr. Moore's release, the statement is not relevant to his guilt or innocence. The statement is relevant only to the extent it is offered to support an inference as to Mr. Mohamed's state of mind during the charged conspiracy. Such an inference is surely available: Mr. Mohamed's sympathetic feelings to Mr. Moore in late 2014 make it more likely that he harbored the same feelings during the charged conspiracy and that he lacked the *mens rea* for the charged crimes as a result. But given Rule 803(3)'s contemporaneity requirement, a statement of Mr. Mohamed's then-existing state of mind cannot be offered to prove that he had the same state of mind in the past. *See Cardascia*, 951 F.2d at 486–88 (affirming exclusion of evidence intended "for use by the jury to infer a state of mind that had occurred six months earlier"). The example statements are either not admissible under Rule 803(3) or are irrelevant. Mr. Mohamed's motion to admit the entire Facebook message history is denied.

### B.  Mr. Hassan's Post-Arrest Recording

In response to the government's motion to preclude defendants from introducing their own out-of-court hearsay statements, Mr. Hassan argues that I should admit his entire videotaped post-arrest statement (presumably not including the statement denying knowledge of Mr. Mohamed, *see* Part VI, *infra*). Def. Abdi Yusuf Hassan's Resp. to Gov't Mots. in Lim. ("Hassan Resp."), ECF No. 154. The government has offered eight portions of the post-arrest statement as evidence, marked as GX 901-A through GX 901-H, and Mr. Hassan argues that the proposed redactions

"would be misleading, violate Mr. Hassan's Fifth Amendment rights, and would be fundamentally unfair" because the excised portions are necessary to convey the tenor and context of the interrogation and the statements made therein. Hassan Resp. 2.

The entire videotaped statement is not admissible under the rule of completeness, for the same reasons discussed in section II.A., *supra*. A general appeal to tenor and context is not sufficient to meet the narrow rule of completeness exception, which requires a showing that specific omitted portions are "*necessary* to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *Johnson*, 507 F.3d at 796 (emphasis added, internal quotation marks and citation omitted). Mr. Hassan has not demonstrated that the entire statement is admissible under the rule of completeness, though I will consider the admissibility of the specific excerpts he identifies.

Mr. Hassan has identified specific transcript passages that he says clarify or explain the government's exhibits. *See* Hassan Resp., Ex. A ("Tr."), ECF No. 154-1. First, he argues that lines 5:7–10:6 are necessary to explain the preceding passage offered by the government in GX 901-A (Tr. 3:17–5:6). At the end of GX 901-A, Mr. Hassan states "three, four people decided this guy can, can get the job done." Tr. 5:5–5:6. In lines 5:7–10:6, Mr. Hassan discusses his job as a government minister and his opposition to piracy, which he argues is necessary to clarify that the "job" he mentions in line 5:6 is not referring to piracy. But the government represents it will not argue that the "job" is piracy. Gov't Reply in Supp. of Suppl. Mots. in Lim. ("Gov't Reply") 9, ECF No. 160. And it is clear from the full exchange in the government's exhibit that Mr. Hassan is discussing his job as the minister of interior and security:

MR. HASSAN: He was — okay. I got there. The president of [Galmadug][2] with the — the region that he was — Michael was arrested, I become Minister of Interior and Security.

AGENT MILLER: Okay. How did you get that position?

MR. HASSAN: To, to my family (U/I), to family over discover — people needed me to get there. One of the position is — was like, three, four people decided this guy can, can get the job done.

Tr. 4:22–5:6.

Next, Mr. Hassan seeks to admit lines 21:23 to 25:3, arguing that omission of that portion makes the government's exhibit GX 901-B (Tr. 10:7–21:22) misleading. Specifically, Mr. Hassan objects to GX 109-B starting with the question, "So how specifically did you become involved with Michael Scott Moore," Tr. 10:7–10:8, and excising a discussion that follows the excerpt in which Mr. Hassan talks about a prior trip to Somalia and says "I never seen him with Garfanj[i]," Tr. 25:3. Mr. Hassan argues that the omitted portions provide context and clarify that Mr. Hassan had not admitted involvement with Mr. Moore's kidnapping. I find that these omitted portions are not necessary to clarify the government's exhibit. Given the nature of the interrogation, the question about "involve[ment] with Michael Scott Moore" does not suggest that Mr. Hassan already confessed to involvement. (If he had, surely the government would not omit that confession.) And any such suggestion is inconsistent with the rest of GX 109-B, in which Mr. Hassan denies any involvement with Mr. Moore's kidnapping. *See* Tr. 14:18–15:9.

The omitted portions that follow GX 109-B (Tr. 21:23–25:3), in which Mr. Hassan describes a 2010 trip to Somalia and says "I never seen him. I never seen him with Garfanji," Tr. 25:3, are also not necessary to clarify the exhibit. The discussion of the earlier trip does not appear relevant. And the omission of the Garfanji remark does not make the question about Garfanji that

---

[2] *See* Gov't Reply 9 n.2.

begins the next exhibit ("You've never met Garfanji? You've never met Michael?" Tr. 25:4–25:5) misleading because Mr. Hassan more than once denies meeting Garfanji and Mr. Moore in GX 109-B. *See, e.g.*, Tr. 25:15–25:16 ("I never seen Michael. I never seen Garfanji.")

Next, Mr. Hassan seeks to admit approximately sixteen pages, lines 28:18 to 44:16, which are omitted between government exhibits GX 901-C (Tr. 25:4–28:17) and GX 901-D (Tr. 44:17–46:1), as well as lines 46:2 to 64:12 and 65:10 to 71:11. Mr. Hassan argues that the first line, 28:18, in which the agent says that Mr. Moore wrote about Mr. Hassan in his book, should be included so he can cross-examine the agent on the accuracy of this statement. In response, the government agrees to extend its excerpt to include line 28:18. Mr. Hassan justifies admission of the rest of the transcript with three specific arguments: (1) in lines 31:24 to 32:12 Mr. Hassan complains about being cold, which speaks to his mental condition during the interrogation; (2) omission of the discussion leading up to the question at 44:17 ("So do you know those people that kidnapped him?") strips GX 901-D (Tr. 44:17–46:1) of context and unfairly excludes Mr. Hassan's explanation regarding how he knew certain individuals were involved in the hostage taking; (3) omission of the exchange beginning at 46:2 creates a misleading impression in GX 901-D that Mr. Hassan knew Mr. Moore's kidnappers by omitting the context for why he was discussing them; and (4) the discussion in lines 65:10 to 71:11 of Mr. Hassan's efforts to combat Al Shabaab and other duties and activities as minister are an integral part of his response to a question posed in GX 109-E (Tr. 64:13–65:9).

None of these excerpts warrant inclusion based on the rule of completeness. Mr. Hassan's complaints about the temperature of the interrogation room do not clarify any of the government's exhibits; however, I will allow cross-examination of the relevant government witness on the interrogation conditions. The omitted portions that surround GX 901-D are not clarifying because

GX 901-D is a contained and discrete set of questions about whether Mr. Hassan knew the kidnappers and their names, two follow-ups about a pirate named Abdi, and Mr. Hassan's answers. The discussion regarding Mohamed Sahal Gerlach that precedes GX 901-D is not directly relevant to the exhibit. And while the discussion about Abdi and Sahal that follows GX 901-D is indeed "part of the subject matter interwoven in the preceding 18 pages," Hassan Resp. 12, similar subject matter is not sufficient to satisfy the Rule 106 standard. Ultimately, omission of the Abdi and Sahal discussion does not render the government's exhibit misleading. Finally, Mr. Hassan's discussion of his performance as a government minister is not necessary to explain the GX 901-E excerpt. Mr. Hassan claims it is misleading to omit the answer to an admitted question, but the answer in 65:13–65:14 ("Well, I caught like four or five Al Shabaab.") is responsive to a question posed in 65:10–65:12 that the government does not seek to admit ("So did you — the military reported to you and the police reported to you? And what kind of stuff did you have them doing at the time?"). The discussion in GX 109-E is about Mr. Hassan's responsibilities as a minister—a logically distinct topic. *See Johnson*, 507 F.3d at 796–97.

Mr. Hassan makes two additional arguments related to his post-arrest interview. First, he argues that the following pre-interview is relevant to the voluntariness of his statement and should be presented to the jury:

> AGENT MILLER: Yes. So, before we talk to you, this is called an advice of rights. You're probably familiar from TV and whatnot. It's your rights to not speak to us or speak to us how you choose to. So I'm going to read through this and this is a form you need to sign if you want to continue to speak to us. Does that make sense?
>
> MR. HASSAN: Well, do I need a lawyer?
>
> AGENT MILLER: You don't need a lawyer. That's — we're about to explain that to you.
>
> MR. HASSAN: Okay.

AGENT MILLER: So —

MR. HASSAN: Do I [arrest now]?[3]

Tr. 1:14–1:25.

Trial judges "shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances" even where the confession has been deemed admissible. 18 U.S.C. § 3501(a). "An assertion that the defendant did not understand his *Miranda* rights is not sufficient to require the voluntariness instruction . . . ." *United States v. Elfgeeh*, 515 F.3d 100, 126 (2d Cir. 2008) (citation omitted). And where "'[t]here was little, if any, evidence from which a jury could infer that the statement was involuntary,' § 3501(a) 'does not require that the jury be specifically charged on voluntariness.'" *Id.* (citation omitted).

I find that the pre-interview exchange is not admissible under § 3501(a). When Mr. Hassan moved to suppress his post-arrest statement based on his Fifth Amendment right to counsel, I held that his waiver of his Fifth Amendment rights was knowing, intelligent, and voluntary. Hassan Resp., Ex. B ("Suppression Hearing Tr.") 67, ECF No. 154-2. Mr. Hassan has not provided other grounds to question the voluntariness of his post-arrest statement, nor has he requested a voluntariness jury instruction. *See* Defs.' Objections to Govt's Proposed Jury Instrs., ECF No. 44. That said, Mr. Hassan's question regarding the lawyer is not hearsay because "a question cannot be used to show the truth of the matter asserted," *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990), and the government represents it has no objection to Mr. Hassan cross-examining their relevant witness on the circumstances of his post-arrest statement, Gov't Reply 24.

---

[3] *See* Hassan Resp. 5 n.4.

Second and finally, Mr. Hassan argues that the government's redactions violate his right to remain silent. This argument principally relies on two authorities—*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) and *United States v. Quinones-Chavez*, 641 F. App'x 722, 727–33 (9th Cir. 2016) (Fisher, J., concurring in part, dissenting in part, and concurring in the judgment)—which suggest the Fifth Amendment may be implicated "when the government offers in evidence a defendant's confession and in confessing the defendant has also made exculpatory statements that the government seeks to omit," *Marin*, 669 F.2d at 85 n.6. But, as described above, the omitted portions of Mr. Hassan's post-arrest testimony do not "paint[] a distorted picture . . . which [he] is powerless to remedy without taking the stand" such that his Fifth Amendment right to remain silent is implicated. *Id.* (citation omitted). Mr. Hassan's entire videotaped statement is not admissible under Rule 106.

## III.   Prior Consistent Statements

The government moves to admit the prior consistent statements of its witnesses if the witnesses' credibility is impeached in defendants' opening statements or on cross-examination. The Federal Rules of Evidence provide an exception to the rule against hearsay when a witness's prior statement "is consistent with the declarant's testimony and is offered . . . to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying" or "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B).

The government is of course correct as a general matter that the Federal Rules allow the admission of a witness's prior consistent statement when offered to rehabilitate the witness following the impeachment of a witness's credibility. However, I defer ruling on this issue unless and until the credibility of a witness has been impeached at trial and a party has offered prior

consistent testimony under Rule 801(d)(1)(B). The parties are reminded that Rule 801(d)(1)(B)(i)
has a timing requirement, such that a prior consistent statement offered to rebut a charge of recent
fabrication or improper influence or motive is admissible only when the statement was "made
before the charged recent fabrication or improper influence or motive." *Tome v. United States*, 513
U.S. 150, 167 (1995).

## IV.    Other Facebook Communications

The government moves to introduce two summary charts of defendants' Facebook data,
GX 1141 and GX 1142, and defendants move to preclude admission of the summary charts as well
as messages between defendants and alleged coconspirators that postdate the end of the alleged
conspiracy, namely GX 1003, GX 1004, GX 1006 to GX 1012, GX 1015, GX 1016, and GX 1063
to GX 1073 (collectively, "challenged Facebook exhibits").[4] Each exhibit has a corresponding
translation.[5]

### A.  Messages Between Defendants and Alleged Coconspirators

The government has produced several trial exhibits depicting Facebook messages between
Mr. Mohamed and Mr. Hassan and other individuals who were allegedly involved in the hostage
taking conspiracy. These messages were all sent after Mr. Moore's release, between 2015 and
2019. Defendants argue that I should defer ruling on the admissibility of these exhibits until the
government identifies the other correspondents and their role in the alleged conspiracy.[6]

---

[4] In response to defendants' motion, the government represents that it no longer plans to offer four
challenged exhibits: GX 1010, GX 1066, GX 1070, and GX 1073. Gov't Opp'n 23 n.5.

[5] As defendants point out in reply, many of the translations appear to contain errors. Defs.' Joint
Reply in Supp. of Mots. in Lim. ("Defs.' Reply") 3 n.3, ECF No. 161. I expect the government to
review the translations and correct all errors in advance of trial.

[6] The government responded that it would share material identifying these individuals no later than
the September 30, 2022, deadline for production of 3500 material. Though that production

Defendants also urge that, absent compelling justification from the government, I should preclude the exhibits because the timing of the messages—all following the end of the charged conspiracy—renders them only marginally relevant and any probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, and misleading the jury. The government argues that the Facebook messages are directly relevant to establishing the relationship between defendants and their alleged coconspirators, corroborating testimony from witnesses whose credibility will be attacked, and refuting statements made by defendants in their post-arrest interviews, or alternatively that the Facebook messages are admissible as "other acts" evidence under Rule 404(b) to prove knowledge, absence of mistake, lack of accident, or identity (in Hassan's case).

A trial court "may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988). Under Rule 404(b), evidence of "any other crime, wrong, or act" is not admissible as propensity evidence, but "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). This Circuit has an "inclusionary approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (internal quotation marks and citation omitted). I may admit other act evidence if it is (1) offered for a proper purpose; (2) relevant to a disputed

---

deadline has since moved with the trial date, in a phone conference of November 20, 2022, the government represented that it would produce nearly all the outstanding 3500 material over the course of the next few weeks.

issue; and (3) its probative value substantially outweighs its prejudicial effect, provided I also give an appropriate limiting instruction if one is requested. *Id.*

I find that the challenged Facebook exhibits are conditionally admissible as direct evidence relevant to establishing the relationship between defendants and their alleged coconspirators. Defendants argue that the messages are irrelevant absent evidence that they knew the individuals they were speaking with and knew that the individuals were involved in the charged conspiracy. But the messages themselves are evidence that defendants knew the individuals to whom they were talking.[7] And while defendants are correct that the messages were all made after the end of the charged conspiracy and most if not all the messages seem to have nothing to do with the conspiracy, the messages are relevant to the extent they make it more likely that defendants knew or had relationships with the alleged coconspirators. Evidence that defendants knew the individuals they were speaking with were involved in the charged conspiracy would certainly add weight to the exhibits, but such knowledge is not a prerequisite to relevance. The exhibits' relevance is of course conditional on the government demonstrating that the Facebook interlocutors were members of the charged conspiracy. Because I find that the messages are conditionally admissible as direct evidence, I do not reach the government's Rule 404(b) argument.

**B.  Summary Charts**

The government's charts, GX 1141 and GX 1142, summarize the number of messages the defendants shared with various individuals. GX 1141 covers "common Facebook contacts" and GX 1142 covers alleged coconspirators. Under the Federal Rules, a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that

---

[7] Save for GX 1070, in which the messages strongly suggest the interlocutors do not know each other. The government has since clarified that it will not offer GX 1070. Gov't Opp'n 29 n.9.

cannot be conveniently examined in court" so long as the originals or duplicates are made available to the adverse party. Fed. R. Evid. 1006. Charts admitted under Rule 1006 constitute substantive evidence. *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020).

Mr. Mohamed, joined by Mr. Hassan, argues that the charts are inadmissible under Rules 401 and 403 and because "the government does not seek to admit the underlying Facebook returns the chart purports to summarize." Mohamed Tahlil Mohamed's Resp. to Gov't Suppl. Mots. in Lim. ("Mohamed Resp.") 2, ECF No. 153. I reject the argument that Rule 1006 requires the government to introduce the underlying Facebook data into evidence. By its plain terms, Rule 1006 requires no such thing. Indeed, such a requirement would frustrate the purpose of the rule, which is to summarize voluminous contents that "cannot be conveniently examined in court." Fed. R. Evid. 1006. Defendants argue that the jury will be unable to determine whether the charts fairly and accurately summarize the underlying data unless the underlying data is admitted into evidence. Mohamed Resp. 3. But the underlying Facebook returns comprise over 50,000 pages, *see* GX 1001, GX 1013, GX 1014, presenting the very problem that Rule 1006 is designed to avoid. By producing and making the Facebook returns available to defendants, the government has satisfied the production requirement of Rule 1006, and defendants can and should object to the charts to the extent their examination reveals inaccuracies in the chart summaries.

I also reject defendants' Rule 401 and 403 arguments regarding the summary charts. For the same reasons explained in section IV.A., *supra*, I find that the challenged Facebook exhibits are relevant to the existence of relationships between the defendants and between defendants and their alleged coconspirators. And while the charts are not particularly probative given that the messages postdate the charged conspiracy, they are also not particularly prejudicial. As defendants explain, the messages that form the basis of the charts, to the extent they are offered as evidence,

"are almost uniformly innocuous." Defs.' Mot. 14. And defendants' lengthy Facebook "friends" lists blunt the impact of the chart of common Facebook message contacts. *See* GX 1003 (Hassan list); GX 1016 (Mohamed list); Defs.' Mot. 15 ("Mohamed had somewhere around 5,000 'friends' and Hassan had well over 1,000 . . . ."). Provided the government lays the proper foundation for the charts, GX 1141 and GX 1142 are admissible as substantive evidence.

## V.     Rolly Tambara Photograph

Defendants' next motion in limine seeks to preclude a photograph, marked GX 223, depicting a fellow hostage, Rolly Tambara, hanging upside down, shirtless, in front of two armed men, one of whom is pointing a grenade launcher at him. Defendants argue that the picture is only marginally relevant, needlessly cumulative, and presents a risk of extreme prejudice.

Relevant evidence should be excluded only if its "probative value is substantially outweighed by the danger of," *inter alia*, "unfair prejudice . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The government argues that GX 223 is relevant and probative as evidence of "an important turning point during Moore's captivity—a calculated and carefully choreographed escalation of the threat to Moore while the sought-after ransom remained unpaid, and one that had its desired effect, as indicated in the ransom call that Moore made immediately following Tambara's torture." Gov't Opp'n 35. Defendants argue that the photograph depicts "visible wounds" on Tambara's chest, "indicating that he has just been tortured." Defs.' Mot. 16. Having studied the photograph, I see no obvious wounds on Mr. Tambara's person. Though the photograph is relatively disturbing, it is "not so gruesome or shocking as to warrant exclusion." *United States v. Chen*, No. 10-CR-671 (KAM), 2011 WL 197585, at *3 (E.D.N.Y. Jan. 20, 2011). And though defendants may be right that the photograph is cumulative of other exhibits, such as the ransom calls and proof of life photographs, to the extent it is offered to prove elements of 18

U.S.C. § 1203, which requires a threat "to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act," and 18 U.S.C. §§ 2332a(a), 924(c), and 924(o), relating to the possession and use of weapons, the photograph is not cumulative to the extent it is offered to corroborate Mr. Moore's anticipated testimony about the escalated threat he faced after the ransom remained unpaid. I find that GX 223 is admissible.

## VI.    Redaction of Mr. Hassan's Post-Arrest Statement or Severance

Mr. Mohamed renews his motion to preclude portions of Mr. Hassan's post-arrest statement denying knowledge of Mr. Mohamed pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), or, in the alternative, to sever defendants' trials. Having previously reserved decision on this motion, Order 2, ECF No. 62, and having denied a motion to suppress the post-arrest statement, Suppression Hearing Tr. 71, I now conclude that Mr. Hassan's post-arrest statement regarding Mr. Mohamed need not be redacted, nor do defendants' trials need to be severed.

In this Circuit, "the well-established rule . . . is that a codefendant's statement must be 'clearly inculpatory' *standing alone* for *Bruton* to apply." *United States v. Slocum*, 695 F.2d 650, 655 (2d Cir. 1982). Defendants argue that the government "will argue that Hassan falsely denied knowledge of Mohamed precisely because he knew Mohamed had engaged in criminal activity with which he (Hassan) did [not] want to associate himself." Defs' Opp'n to Gov't Mots. in Lim. 1, ECF No. 51. But the denial of knowledge of Mr. Mohamed is not clearly inculpatory standing alone. Standing alone, Mr. Hassan's statement is simply a denial that Mr. Hassan knew Mr. Mohamed. Any inculpatory meaning to this statement would attach "only when linked with evidence later introduced at trial." *Richardson v. Marsh*, 481 U.S. 200, 208 (1987). The motion to redact this portion of the post-arrest statement or sever the defendants for trial is denied.

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated:        October 26, 2022
              Brooklyn, New York